IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRAYLINE BAKER                                                                    PLAINTIFF

v.                    Civil No. 5:21-cv-05013-PKH-CDC

OFFICER CHARLES BROCKMEYER,
Bella Vista Police Department ("BVPD");
DETECTIVE JOSHUA DUGGAN, BVPD;
SERGEANT LUCAS HENSON, BVPD;
DETECTIVE ED WILLIAMS, BVPD; and
OFFICER C. SKAGGS, Benton County
Detention Center                                                                  DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Brayline Baker ("Baker"), filed this civil rights action under 42 U.S.C. § 1983.

Baker proceeds *pro se* and *in forma pauperis* ("IFP").   Baker maintains his constitutional rights

were violated on August 11, 2020, when he was pursued by the Defendant Bella Vista Police

Department ("BVPD") officers, force was used to arrest him, and, after a trip to the hospital, he

was transported to the Benton County Detention Center ("BCDC") in an unconscious state.   Baker

further maintains Officer Skaggs, the BCDC intake officer, violated his rights by accepting him

into the detention center in an unconscious state and changing his clothing.[1]

The case is before the Court on the Motion for Summary Judgment (ECF No. 31) filed by

Officer Skaggs and the Motion for Summary Judgment (ECF No. 35) filed by the Bella Vista

Police Department members Officer Brockmeyer, Detective Duggan, Sergeant Henson, and

Detective Williams (collectively the "BVPD Defendants").   Plaintiff has responded (ECF No. 50)

---

[1] This case was stayed and administratively terminated from May 17, 2021, until June 27, 2022, pursuant to *Younger v. Harris*, 401 U.S. 37 (1971) due to the pending state criminal charges against Baker arising out of the incidents at issue in this lawsuit.   (ECF Nos. 21 & 24).

to the Motion.   Additionally, in Baker's Response (ECF No. 50), he maintains he is entitled to judgment in his favor as a matter of law.   The BVPD Defendants have replied.   (ECF No. 52). The Motions are now ready for decision.   Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable P. K. Holmes, III, Senior United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation on the pending motions.

## I.   BACKGROUND

### A.   The Facts from Baker's Perspective

On August 11, 2020,[2] Baker, an African-American, was traveling from Dallas, Texas, to Kansas City, Missouri, by bus.   (ECF No. 33-8 at 32).[3]   At the time, Baker was wearing a white shirt and jean shorts.   *Id.* at 50.   Baker boarded the Jefferson Lines bus at the Texarkana hub.[4] *Id.* at 33.   Baker soon fell asleep and woke when someone exited the restroom and bumped or stepped on his foot.   *Id.* at 34.   Baker then entered the restroom and noticed it smelled slightly of cigarette smoke.   *Id.*   Baker did not pay attention to the smell because the bus was old and smelled of mold or "something" he could not put his "finger on."   *Id.*

While he was in the restroom, Baker felt the bus "pulling over" so he hurried to return to his seat.   (ECF No. 33-8 at 34-35).   The bus driver, Robert Hogue ("Hogue"), checked the restroom and then approached Baker and asked him if he had been smoking in the restroom.   *Id.* at 35.   Hogue stated he had warned passengers that it was a violation of federal law to smoke on a bus.   *Id.*   Baker denied smoking in the restroom.   *Id.*   Hogue replied that Baker had just been

---

[2] The journey began on August 10, 2020.   (ECF No. 33-8 at 32).
[3] All citations to the summary judgment record are to the CM/ECF document and page number rather than to the exhibit numbers or letters designated by the parties.
[4] Texarkana lies on the border of Texas and Arkansas.   Baker did not specify, and may not have known, whether the stop was on the Texas side or the Arkansas side.

in there smoking.   *Id.* at 35-36.   Baker again denied smoking and said someone had used the restroom right before him.   *Id.* at 36.   Hogue walked to the front of the bus, grabbed something, and stepped off the bus.   *Id.*

At this point, Baker grabbed his two bags and got off the bus.   (ECF No. 33-8 at 37). Baker said to Hogue:  "Excuse me, sir.  Is there a problem? What's going on?"   *Id.*   Hogue turned his back and was talking "real low" on the phone but did reply to Baker's inquiry.   *Id.* Baker denies that Hogue said he was calling the police.   *Id.*   Baker denies that Hogue told him that he was going to be removed from the bus at any point.   *Id.* at 44.   Baker, who did not want any problems and felt there might be a conflict, told Hogue he was just going to leave from there and began walking away.   *Id.* at 39 & 48.   Baker testified that the back of the bus ticket said that you can forfeit your ride at any given moment and have the driver pull off at a safe location and let you off.   *Id.* at 38.

The bus had been traveling northbound and pulled over to the right.   (ECF No. 33-8 at 39-40).   Baker went to the left sprinting across the northbound lanes, through the grassy medium, and across the southbound lanes.   *Id.* at 40 & 49   *Id.*   Baker felt he was just taking himself out of what could become an unpleasant situation.   *Id.* at 48.   Baker's plan was to walk to the nearest gas station and call for a ride home.   *Id.* at 41.

Once Baker was across the highway, he saw a man operating a backhoe and approached him asking the way to the nearest gas station.   (ECF No. 33-8 at 49).   The backhoe operator was at the edge of the highway grass and about two feet onto a golf course.   *Id.*   After Baker got the information from the backhoe operator, he saw someone in the distance approaching at a fast pace. *Id.* at 50.   When asked how far away the man was, Baker had difficulty estimating the distance first saying about 400 feet, then one to two yards away, then about five or six yards away, and

finally about four conference rooms away.   *Id.* 50 & 53-54.   The man was wearing tan pants and a blue shirt and coming from southbound lane of the highway.   *Id.* at 51 & 54.   The man, later identified as Detective Duggan, had his arm extended with a gun pointed in Baker's direction; the barrel of the gun was aimed slightly above Baker's head and toward the sky.   *Id.* at 51-52.   Baker did not know if Detective Duggan was wearing a holster.   *Id.* at 52.   If Detective Duggan announced he was a police officer, Baker did not hear him.

Baker took off running "for his life" across a bridge on the golf course and following a trail into the woods.   (ECF No. 33-8 at 56-57).   As he was running, Baker could hear someone chasing him.   *Id.* at 58.   Baker had a backpack and a bag of clothes.   *Id.* at 60.   The bag became hooked on a tree and his clothing and shoes fell out.   *Id.*   Baker did not stop to retrieve the items.   *Id.* Baker also lost his phone while he was running.   *Id.* at 61.   After he ran for forty-five minutes to an hour, Baker came to a home on Abingdon Lane.   *Id.*   The garage door was open and a man, later identified as Michael Clifford ("Clifford"), was working there.   *Id.*   Baker approached, stated he was stranded; had been cutting through the woods; asked to use a phone; and asked for a ride or directions to the nearest gas station.   *Id.* at 61-62.   Clifford responded that Baker could use his phone but that he could not give Baker a ride.   *Id.* at 62.   Baker also asked for water and was given bottled water.   *Id.*   Baker took a seat in a chair about two feet inside the garage.   *Id.* at 63.   Clifford handed Baker his cell-phone but it was pass-code protected.   *Id.*   Baker handed it back.   *Id.*   Clifford unlocked the phone and passed it back to Baker.   *Id.*

At this point, before Baker could make a phone call, he saw a dark-colored Dodge Durango with "a white guy hanging out the passenger side" looking "real aggressive."   (ECF No. 33-8 at 63).   Baker heard the Durango turn around and saw two men running up to the garage with their

guns drawn on him.  *Id.*   Baker testified the incident in this case occurred after the George Floyd[5] incident so he was already on the alert and "aware that police are killing and beating people in America and killing majority black people."  *Id.*  at 64.   As the officers, Detective Duggan, Officer Brockmeyer and Sergeant Henson, approached him, Baker stood up and turned his back. *Id.*  When the officers approached the garage, Baker knew they were police officers because they said:   "Police.   Put your hands up."   (ECF No. 33-8 at 66-67).   Baker had the cell-phone in his right hand and the backpack strap in his left hand.  *Id.* at 65 & 68.   Baker believed he was going to be shot.  *Id.* at 65.   Baker denies ever reaching into his backpack during the encounter.  *Id.* at 68.   Instead, he says he was going to swing the backpack over his shoulder and go to the door leading to the house and "maybe just lay down on that side."  *Id.* at 69.   Baker wanted anyone who was in the house to be able to see what was happening.  *Id.*

According to Baker, as Detective Duggan ran up to him and began choking him from behind and took him to the ground.   (ECF No. 33-8 at 81 & 93).   Baker landed face first hitting the ground with his chin which forced his mouth closed and shattered his back teeth.[6]  *Id.* 70 & 73.   At this point, Baker testified that three or four officers were present.  *Id.* at 73.   His arms were stretched out.  *Id.* at 81.   Officers were yanking on both of his arms and Baker testified he naturally resisted a "little bit" trying to get Detective Duggan off his trachea.  *Id.* at 74 & 93.   The officers yelled stop resisting.  *Id.* at 82.   The next thing he knew, Baker said an officer was saying tase him, tase him again.  *Id.*   Baker was tased twice on his left arm.  *Id.* at 84 & 93.   Baker's whole body went numb and then there was a "kind of . . . blackness."  *Id.* at 82.   His body was

---

[5] George Floyd was killed on May 25, 2020.
[6] Baker testified he asked to see a dentist and for medical treatment while at the BCDC.   (ECF No. 33-8 at 70-71).   However, there are no dental or medical care claims asserted in this case.

bruised all over including his face.   *Id.*

Detective Williams assisted in holding Baker's arms and legs, the hand-cuffing, and the arrest.   (ECF No. 33-8 at 91).   Officer Brockmeyer held Baker's right arm, and bent two of his fingers back dislocating them.   *Id.* at 92.   Officer Henson was on his left side "folding and bending" Baker's arm.   *Id.*   Officer Henson was the officer who tased Baker.   *Id.*   Detective Williams was on Baker's legs.   *Id.*   Baker testified the officers were handcuffing him, tasing him, and hitting him all at the same time.   *Id.*   Baker stated that he could not breathe with the four officers on top of him and lost consciousness.   *Id.* at 93.

The next thing Baker recalls is being wheeled into the hospital on a stretcher.   (ECF No. 33-8 at 82).   Baker remembers choking on his teeth and the doctor removing some from his throat. *Id.*   He was told he was at the hospital and asked what happened to him.   *Id.* at 83.   Baker testified he responded:   "They beat me.   They beat me."   *Id.*   The officers denied it and responded he had been tased.   *Id.*   The next thing he knew he received an injection and lost unconsciousness.   *Id.*

Baker does not recall being transported by Officer Brockmeyer to the BCDC.   (ECF No. 33-8 at 87).   Baker maintains he was unconscious while transported.   *Id.*   When he woke up, Baker was in the BCDC in a jumpsuit with no underwear or socks.   *Id.*

Officer Skaggs was the BCDC intake officer.   (ECF No. 33-8 at 104).   Baker testified he was not awake when he was accepted into the BCDC.   *Id.*   Baker first saw Officer Skaggs when Baker woke up in a cell; Officer Skaggs was at the window.   *Id.* at 123.   Baker maintains Officer Skaggs should have refused to accept him because he was unconscious, drugged, incoherent and did not know where he was.   *Id.* at 132, 142 & 150.   Baker denies he has any ecstasy in his system on August 11, 2020.   *Id.* at 143.

Although he has no recollection of it, Baker believes Officer Skaggs was the person who changed him from a hospital gown, socks, and underwear, into a jumpsuit, no socks, and no underwear.  (ECF No. 33-8 at 139, 141-142).  Baker's allegation that Officer Skaggs sexually assaulted him is based on the fact that his underwear was removed; he believes he could have been touched sexually.  *Id.* at 140.  In fact, Baker believes the act of removing an unconscious person's clothes constitutes sexual assault.  *Id.*  Baker mentioned that his whole genital area was sore but testified it could have been a result of the use of force during his arrest.  *Id.* at 157-58.  Baker stated he just did not know what happened when he was undressed but he needed to know.  *Id.* at 158-59.  Baker contends accepting someone into the detention center in an unconscious state went against BCDC policy and the law.  *Id.* at 150.

Baker did not believe he should have been hunted for allegedly smoking a cigarette on the bus.  (ECF No. 33-8 at 74).  Baker believes they came "after [him] because [he] was an African-American male in the state of Arkansas getting off the bus from a scene that they think was confrontational, but not life-threatening."  *Id.* at 76-77.

As a result of the use of force, Baker testified he had bruises and lacerations all over his body including on his chest, face, back, thighs, legs, arms, and neck; his eye was swollen; his teeth were broken; and he had burns up and down his left arm.  (ECF No. 33-8 at 94).  Baker maintains the injury to the two fingers on his right hand is permanent; Baker testified he would never be able to straighten the fingers out again.  *Id.* at 100.  Baker testified he was denied employment opportunities because of the pending criminal charges.  *Id.* at 96.  Finally, Baker claims mental injuries as a result of the incident including post-traumatic stress disorder ("PTSD").  *Id.*  He testified he was diagnosed with PTSD by a therapist at the BCDC.  *Id.* at 99.

### B. The Facts from Defendants' Perspective

On August 11, 2020, Officer Terry Dickey was dispatched to an unwanted persons call. (ECF No. 35-7 at 6).   Officer Dickey was advised that Hogue had pulled a Jefferson Lines bus over on Highway 71 northbound between Kingsland Road and Trafalgar Road.   *Id.*   Hogue advised Baker had been smoking on the bus.   Hogue pulled over to confront Baker.   *Id.* Dispatch advised that Baker ran west onto the golf course when told by Hogue that he was calling the police.   *Id.* at 6-7.   When Officer Dickey arrived at the bus, Hogue reported pulling over to inform Baker, who denied smoking, that he would be removed from the bus when it got to Joplin. *Id.* at 7.   Hogue stated he called the police in case Baker became belligerent.   *Id.*   Hogue stated Baker did not want the police involved and took off running west toward the golf course.   *Id.* Baker was identified at this point by going through the bus tickets.   *Id.*   Hogue advised there had been no disturbance and he did not want to file charges.   *Id.*   Hogue filled out a voluntary witness form.   *Id.*   Officer Dickey then spoke with the bus occupants who all stated they did not smell any smoke.   *Id.*   Lieutenant Vanatta and other officers were in the area searching for Baker and Officer Dickey relayed the information to them.   *Id.*   Officer Dickey then heard Baker had been found and arrested.   *Id.*

Detective Duggan by declaration states he responded to a dispatch call that a person was causing a disturbance on a bus at Trafalgar and Highway 71.   (ECF No. 35-4 at 1).   Hogue called 911 stating he found Baker smoking in the bathroom which was a federal offense.   *Id.*   When Hogue confronted Baker and told him the police had been called, Detective Duggan reported that Baker ran from the bus toward the golf course.   *Id.*   Detective Duggan believed a confrontation occurred because the bus driver pulled over, stopped the bus, and called 911.   *Id.*   Dispatch stated they were looking for a black male, white shirt, and multi-colored blue shorts.   *Id.*   Detective

Williams was riding with Detective Duggan in an unmarked dark grey Dodge Durango and they responded to assist patrol.   *Id.*

Detective Williams spotted Baker walking into the tree line on the golf course approximately 200 yards from the bus.   (ECF No. 35-4 at 1);(ECF No. 35-5 at 1).   Detective Duggan radioed Lieutenant Vanatta and Officer McCool to direct them to where the suspect had been seen.   *Id.* at 2.   They drove to the area and Detective Duggan saw Baker talking to a backhoe operator.   *Id.*   Detective Duggan exited his vehicle and approached Baker.   *Id.*   Detective Duggan indicates he was wearing dark colored pants, a dark colored buttoned shirt tucked in at the waist, with his badge and gun visible at his beltline.   *Id.*   Since he did not know why Baker had been running and he had a backpack, Detective Duggan pulled his firearm from the holster, held it as his side, and yelled "police" and told Baker to put his hands up.   *Id.*   According to Detective Duggan, Baker glanced his way "for a split second" and "immediately took off running southwest and into the trees" following a newly built trail.   *Id.*   Detective Duggan ran after Baker.   *Id.* Detective Duggan noticed Baker throwing clothing and articles from his backpack.   *Id.* Detective Duggan lost sight of Baker.   *Id.*   Detective Duggan indicates he was not able to hear radio traffic for approximately thirty minutes; he asserts he never heard the communication that the bus driver did not want to press charges and would be leaving.   *Id.* at 6.   Lieutenant Vanatta and Officer McCool, a uniformed patrol officer with his K-9 Cabo, continued pursuing Baker.   *Id.* at 2.

Lieutenant Vanatta responded with Officer McCool and his K-9 and started looking for Baker on the golf course.   (ECF No. 35-6 at 1).   He and Officer McCool were in uniforms.   *Id.* Lieutenant Vanatta observed Baker running towards their location at the base of the creek bridge ramp.   *Id.*   Baker had his backpack in front of his body and was digging in the backpack.   *Id.*

Lieutenant Vanatta drew his firearm and called out to Baker identifying himself as law enforcement.   *Id.*   Baker turned and continued to run across the bridge.   *Id.*   They followed Baker but lost sight of him.   *Id.*   They discovered items of clothing and K-9 Cabo began tracking to the south.   *Id.*   They continued to track Baker until Blenheim Road.   *Id.*

Detective Duggan and Detective Williams continued to search by vehicle.   (ECF No. 35-4 at 3).   As they were searching, Detective Duggan learned from dispatch Baker's identity; he had no active warrants; but he had convictions for assault and/or battery, fleeing, resisting, and robbery which "raised" Detective Duggan's "suspicion as to why he was running from police presence." *Id.*   When they drove down Abingdon Lane, Detective Duggan spotted Baker seated in a lawn chair near the open garage of 12 Abingdon Lane next to an older white male with a white beard. *Id.*   They drove to the cul-de-sac, turned around, and went back.   *Id.*   Detective Williams radioed for additional units and Officer Brockmeyer and Sergeant Henson arrived quickly.   *Id.*

Detective Duggan approached from the far-left side of the garage to prevent Baker, who was now wearing a black shirt, from running around the house.   (ECF No. 35-4 at 4).   Officer Brockmeyer and Sergeant Henson approached from the right side of the garage.   *Id.*   Detective Duggan did not have his weapon or taser drawn.   *Id.*   As Detective Williams approached, Baker "took the backpack he was holding, quickly put his hand inside, and turned to face away from the officers.   [Baker] then started walking towards the interior door from the garage to the home." *Id.*   At the same time, Clifford started saying he did not know Baker.   *Id.*   Detective Duggan ordered Baker to show his hands but he "continued to dig in the backpack."   *Id.*   Because of his training, Detective Duggan "feared" Baker was "going for a weapon."   *Id.*   Detective Duggan "rushed forward and grabbed [Baker] from behind on the back of the neck and shoulder.   [Baker] continued to turn away from [Detective Duggan] so [he] grabbed [Baker] around [his] head and

10

forced him to the ground." *Id.* The two landed face down with Detective Duggan on top of Baker with his arm under Baker "to where it was around [his] neck." *Id.* Baker "continued to try and dig in the backpack with his right hand which was now under him." *Id.* Detective Duggan and the other officers were yelling at Baker to give up his hands and get them out of the backpack. *Id.* Baker "continued to fight, using his legs to push off, turning his head and clenching his muscles, and keeping his hands underneath him." *Id.*

Detective Duggan heard Sergeant Henson tell Baker he would be tased if he did not comply. When Baker continued to resist, Sergeant Henson "drive stunned [Baker] in the left arm twice, which allowed us some leverage to get his left arm from underneath him." (ECF No. 35-4 at 5). Detective Duggan still had control of Baker's head and "pulled him up away from the floor as he continued to fight with officers." *Id.* at 5. Officer Brockmeyer was to Detective Duggan's right and trying to get control of Baker's right arm. *Id.* Once Baker was handcuffed, they "immediately stood him up and carried him outside." *Id.* The entire encounter took less than a minute. *Id.* Once outside the garage, Baker stated he was not reaching for a gun and then went limp and became dead weight. *Id.* Detective Duggan performed a sternum rub on Baker's chest to test for alertness and to make sure he was breathing. *Id.* Baker would "come to and talk for a moment and then went limp again." *Id.* EMS was called. *Id.* Baker continued to act "as if he was seizing but then would stop and say things like 'it's not my backpack.'" *Id.* Baker was laying on his side and was kept in that position "until he tried hitting his head on the road, so [Detective Duggan] put [his] foot under [Baker's] head to keep him from hitting the ground." *Id.*

Once they sat Baker in an upright position, Detective Duggan indicates Baker tried to spit on the officers and began to "scoot away." (ECF No. 35-4 at 5). Detective Duggan kept Baker's head still "by controlling his head with one hand on each side so he could not spit on officers."

11

*Id.*   When EMS arrived, Baker's "refused to cooperate . . . by forcing his eyelids closed and not answering questions."   *Id.* at 6.   Baker was taken to the hospital.   *Id.*

During the encounter, Detective Duggan suffered bruising to his upper right chest area and his cell phone case was cracked.   (ECF No. 35-4 at 6).   Baker's backpack contained a loaded .40 caliber handgun, plastic baggies, a Biotin vitamin bottle with 45 ecstasy pills inside, a black digital scale with marijuana residue, a bus ticket, clothing, shoes, and electronic cords.   *Id.*

Having been told Baker was walking across the golf course, Detective Williams followed a short distance noticing someone had left a black cell phone, underwear, a pair of boxer shorts, and a pair of shoes.   (ECF No. 35-5 at 2).   Detective Duggan then informed Detective Williams that Lieutenant Vanatta and Officer McCool were chasing Baker.   *Id.*   As he headed back to his vehicle, Detective Williams saw the backhoe operator who reported that Baker had walked up to him and asked for a ride.   *Id.*

When they reached Abingdon Lane, Detective Williams, who was driving, turned around and headed back up the street.   (ECF No. 35-5 at 2).   Detective Williams radioed dispatch to advise the officers were out at the house with Baker.   *Id.*   By the time he arrived at the garage, Detective Williams observed Detective Duggan, Officer Brockmeyer, and Sergeant Henson on the ground with Baker.   *Id.* at 3.   Baker was refusing to place his hands behind his back and failing to comply with their orders.   *Id.*   Detective Williams whose attention was on Clifford heard someone "say Taser and the sound of the Taser being deployed."   *Id.*   Detective Williams assisted by placing the handcuffs on Baker.   *Id.*   This was the first physical contact Detective Williams had with Baker.   *Id.*   The other officers then led Baker to the street.   *Id.*

Officer Brockmeyer arrived at the scene with Sergeant Henson in a marked patrol car. (ECF No. 35-11 at 1-2).   As he approached the garage, Officer Brockmeyer heard Detective

Duggan order Baker not to move.   *Id.* at 2.   Baker did not comply and walked further away and into the garage with his hands in his backpack.   *Id.*   Officer Brockmeyer drew his taser but holstered it to assist Detective Duggan after he ran after Baker and grabbed him.   *Id.*   Officer Brockmeyer heard Clifford yell that Baker had a gun.   *Id.*   Once on the ground, Officer Brockmeyer was on Baker's "right side straddling his right leg."   *Id.*   Officer Brockmeyer struggled to gain control of Baker's right arm which was underneath him in the backpack.   *Id.*   Officer Brockmeyer yelled for Sergeant Henson to tase Baker.   *Id.*   Even after he was drive stunned twice, Officer Brockmeyer indicates Baker continued to resist.   *Id.*   Once Sergeant Henson gained control of Baker's left arm, they were able to get him handcuffed.   *Id.*   They stood Baker up and escorted him to the end of the driveway.   *Id.*   Once Baker acted as if he went unconscious, Officer Brockmeyer performed a sternum rub on his chest as a pain stimulus to test alertness.   *Id.* at 3.   Officer Brockmeyer also checked Baker's pulse.   *Id.*

As they were trying to search his person, Baker attempted to reach in his back pocket and Officer Brockmeyer "had to move his hand away from his pocket."   (ECF No. 35-11 at 3).   Officer Brockmeyer then discovered a pill bottle with "several multi-colored pills" in Baker's pocket.   *Id.*

Officer Brockmeyer spoke with Clifford who reported Baker walked up to the house and asked to use his phone.   (ECF No. 35-11 at 3).   Clifford reported that Baker never used the phone and just paced around and attempted to walk into the house.   *Id.*   Clifford reported holding up a stick to prevent Baker from entering the home.   *Id.*

As Sergeant Henson was approaching the garage, Detective Duggan rushed Baker, grabbed him from behind, and took him to the ground.   (ECF No. 35-10 at 2).   They all ended up on the ground and Sergeant Henson tried to gain control of Baker's left arm.   *Id.*   Baker was reaching

inside of the backpack that was underneath him.  *Id.*  Sergeant Henson ordered Baker to give up his hands or he would be tased.  *Id.*  Baker did not comply; Sergeant Henson deployed his taser in drive stun mode to gain control of Baker's left arm.  *Id.*  "The Taser deployment only lasted a couple of seconds because [Baker] started moving his arm" and Sergeant Henson "could not keep a good connection.  *Id.*  While Baker's arm started to come out from underneath his body, Sergeant Henson still could not gain control.  *Id.*  Sergeant Henson deployed a second "drive stun to the same spot and almost immediately" he gained control of Baker's arm.  *Id.*  Baker was placed in handcuffs.  *Id.*

Baker was taken by ambulance to Mercy Hospital Northwest Arkansas.  (ECF No. 33-9 at 2).  The chief complaint was listed as:  "Altered mental status (pt tased by police and appeared to have a seizure afterward)."  *Id.*  Baker's visit diagnoses were listed as:  "MDMA[7] abuse (primary)," "Shock from electroshock gun, initial encounter," and "Delirium."  *Id.*; *see also Id.* at 29 (after visit summary).  Baker's level of consciousness was reported to be "Awake/Alert, Confused/Disoriented."  *Id.* at 4.  The notes state:

> Pt was running from police when he was tased, pt arrives via BV EMS.  Report is that patient was kicked off grey hound bus for smoking.  He had a gun and was running from police when tased.  He appeared to have a seizure and was brought in.  Upon arrival pt as calm, awake, disoriented.  Pt is stuttering and unable to speak clearly to answer staff questions.  Multiple staff and EMS were required for starting an IV.  Pt was not combative but did not comprehend when staff was starting the IV and was taken by surprise, causing him to yell out and attempt to withdraw arms.
>
> * * *
>
> Pt has 3 marks on left tricep from taser.  Police officers at bedside state that he was "dry tased" one time.  Pt inspected for more marks.  None found at this time.

---

[7] MDMA is the abbreviation for the drug Methylenedioxymethamphetamine in the tablet or capsule form.  The street name for the drug is ecstasy.  https://nida.nih.gov/research-topics/mdma-ecstasymolly (accessed March 20, 2023).

* * *

[P]t arrives repeatedly saying "dont taz me—I dont want to be tazed."

***

([P]t agitated—reported ec[s]tasy use)

*Id.* at 5, 6, & 8.   Baker was given two Lorazepam injections.   *Id.* 9.   Baker was noted to be

sedated, cooperative with exam and responsive to commands, but then going back to sleep.   *Id.*

A facial contusion to his right zygoma was noted.   (ECF No. 33-9 at 8).   No fracture was

noted to exist but "[r]ight preorbital and periorbital soft tissue swelling" existed.   *Id.* at 9.   No

other notations were made regarding any lacerations, bruising, swelling, or other injury to Baker's

face or body.   *Id.* at 14.   No injuries were noted to Baker's teeth.   *Id.*   Baker was released to

police custody.   *Id.*

Officer Brockmeyer transported Baker to the BCDC.   (ECF No. 35-11 at 3).   Officer

Brockmeyer asserts that Baker was conscious when they placed him in the patrol car and when

they arrived at the BCDC.   *Id.*   Officer Brockmeyer filled out the intake form and then left.   *Id.*

Baker was booked into the BCDC on the following charges:   disorderly conduct, fleeing,

resisting arrest, possession of a firearm by certain persons, aggravated assault on a certified law

enforcement officer; possession of a Schedule I substance with intent to deliver, simultaneous

possession of drugs and firearms, and possession of drug paraphernalia.   (ECF No. 33-2 at 12).

Ultimately, these criminal charges were dismissed.   (ECF No. 23).

Officer Skaggs completed the criminal detention intake form.   (ECF No. 33-2 at 12).

According to Officer Skaggs, Baker "was conscious but drowsy" when he entered the BCDC.

(ECF No. 33-10 at 1).   Officer Skaggs recalled Baker exiting the police car and walking "with

some assistance" into the BCDC.   *Id.*   Baker was received approximately three hours after his

arrest.   *Id.* at 2.   Officer Skaggs indicates that the BCDC does not accept detainees in an

unconscious state. *Id.* Because Baker had been to the emergency room and medicated, Baker and the paperwork from the hospital were reviewed by the nurse[8] on duty before Baker was accepted. *Id.* According to Officer Skaggs, the nurse cleared Baker for acceptance and instructed him to allow Baker to "come down from the medication he had been given." *Id.* Baker was searched by Deputy Jordan who noted Baker was unable to sign because he was "in detox." *Id.* Officer Skaggs reports that "Baker was given a jail uniform to put on and he took off his hospital gown that he was wearing. Baker was conscious when he changed his clothes." *Id.* Baker was placed in a holding cell where he slept for hours before he was formally booked in. *Id.* While Officer Skaggs was in the booking area, Baker did not cause any problem and appeared to be sleeping the "majority of the time he was in the holding cell." *Id* at 3. Officer Skaggs filed no incident report "because there was nothing unusual about the booking." *Id.* As a result, no video was preserved.[9] *Id.* Officer Skaggs indicates it is "fairly common to allow new intakes to come down from any medication or intoxication before booking." *Id.*

Baker was booked in by Deputy Merritt. (ECF No. 33-2 at 12). The booking photograph of Baker is of poor quality. *Id.* at 2.

---

[8] The nurse is not identified in the summary judgment record and no other information about this examination is presented.

[9] *See also* (ECF No. 48) affidavit regarding video having been overwritten pursuant to the normal operation of the video system.



## BAKER, BRAYLINE DONNELLE - #236322

As can be seen, the entire right side of Baker's face is in shadow and it is not possible to visualize the injury to that side of his face noted to exist in the hospital records. *Id.* The left side of Baker's face bears no signs of obvious injury although it is possible there is a bruise or contusion above his eye brow and to the right side his forehead. *Id.* Baker's mouth and chin are also in the shadow and it is impossible to discern if there are any injuries. *Id.*

### C. The Contents of the Flash Drive

The flash drive contains 7 separate audio and/or video files.

The following is a brief recap of the relevant portions of those files. The first file, labelled

Exhibit 2, is an audio recording of the 911 call placed by Hogue.   Hogue sounds calm.   He reports he is driving a Jefferson Lines passenger bus northbound on the highway and needs assistance because he will be removing a passenger from the bus for smoking, a federal offense.   Hogue reports the passenger does not want the police involved.   Hogue indicates he wants a Bella Vista officer there for assistance.   After the operator indicates she has a couple of officers headed his way, Hogue responds the passenger jumped off the bus and took off on foot.   Hogue reported he did not know what was wrong with the passenger just that he did not want to be "messed with." Hogue indicated the passenger was headed to the golf course.   Hogue identified the passenger as a black male wearing a white t-shirt and multi-colored blue shorts.

The file labelled exhibit 3 contains radio traffic between 1252-1311.   The dispatcher reports the basic contents of the 911 call.   The dispatcher reports that Hogue went through the tickets and identified Baker.   Various officers reported looking for the subject, speaking with a groundskeeper, needing the assistance of other officers, and possible locations.   One officer remarked that Baker was running for a reason—probably had warrants.   An officer reports his belief that Baker is in the woods running on the new trail system.   Baker was crossing the new bridge with officers in full pursuit.   Officers reported being on the bridge headed towards Reardon.

The file labelled exhibit 9 contains radio traffic between 1312 and 1442.   Baker is reported to be a felon with a number of convictions—give in terms of signals.   As explained by Detective Duggan, the signals meant that Baker had been convicted of assault and/or battery, fleeing, resisting arrest, and robbery.   (ECF No. 35-4 at 3).

The officers report various places they believe Baker may be, or provide directions and locations he is heading, and sightings of Baker.    A report is made that Hogue just wanted to make

sure Baker was okay so they could drop him at the next stop.    A statement is made advising the officer that Hogue does not want anything done; and asking if Hogue may get back on the road. Hogue is told he can leave.   The officers continue looking for Baker.

The officers begin searching a housing area where the trail ends.   The officers are e-mailed Baker's most recent mug shot.   Officers were advised that it looked like the trail could come out around Abingdon Lane.   A statement is made that Baker was last seen by officers crossing the bridge at the golf-course.

An officer reporting Baker had been located at 12 Abingdon.   Other units were dispatched to the scene.   An officer reported that Baker was actively resisting.   A medic was requested. Baker acting like he is having a seizure.   Firearm found on Baker.   Asking that the pills in Baker's possession be identified once taken back to station.   Baker was taken to the emergency room at Mercy.

The file labelled exhibit 13 contains the dash cam video from Officer Larson's vehicle. When the video begins four officers can be seen with Baker on the ground at the end of the drive way.   Only Baker's torso and legs can be seen.



Three officers are standing one at Baker's head; one on his left side; and one at around the area of his hips.[10]   The remaining officer is crouched near Baker's upper torso and head.   Baker's legs and body can be seen twitching, kicking, or flailing around.   The officer located at Baker's legs can be seen attempting to hold Baker's legs.   Baker is rolled so he is face down and then placed on his side.   His legs continue to flail.   The ambulance arrives and Baker was placed onto the stretcher and taken to the hospital.

Officers begin searching Baker's backpack on the hood of Sergeant Henson's vehicle completely obstructing any view of Baker for periods of time.   The magazine of the High Point 9-millimeter pistol is removed as is a bullet from the chamber.

As this is occurring, an officer begins speaking with Clifford who reports he was working at the home.   The two walk toward the home to speak to the home owner, Michael Woodringe ("Woodringe").   Clifford reports he was sitting there cleaning tile when Baker came up.   Baker asked for a ride to the highway and to borrow Clifford's phone.   Baker then asked if Clifford

---

[10] The pictures are screen shots taken from the video.

minded if he changed his shirt because it was all wet.   Clifford stated he did not mind.   Baker changed into a black shirt.   Clifford handed Baker his phone.   Clifford reported Baker had opened a tool bag that was in the garage.   The homeowner indicated the bag contained knives and various other items he cleaned out of his truck.   As the police arrived, Clifford reported Baker reached into his backpack.   Clifford indicated he did not know if Baker was putting something back in the backpack or getting something out.   Clifford states everything happened at once and he went to cut Baker off as he turned toward the back of the garage.   Clifford was afraid Baker would go into the house.   Woodringe states that he had guns in the house.   An officer walks toward the patrol car where Baker's backpack had been searched and reports that Baker may have taken some items out of Woodringe' s tool bag.   Nothing in the backpack belonged to Woodringe. The remainder of the video is not relevant.

The video file labelled exhibit 15 contains body cam video from Sergeant Henson.   This video is taken at such close range and Sergeant Henson is moving around making it difficult to visualize what is occurring.   The area is also dark and the screen is black at various points.   The audio is distorted.   It appears Sergeant Henson is trying to gain control of Baker's arm.   Voices can be heard telling Baker to stop.   The taser can be heard being deployed for a short period. Sergeant Henson apparently then moved because a pair of shoes can be seen.   One of Baker's legs comes into view.   The taser is again deployed   The video ends.

The video labelled exhibit 16 is from Sergeant Henson's dash cam.   The audio is only on when an officer speaks to dispatch.   This video offers a better view of Baker.



Baker is at the end of the driveway being held between two officers.   He is at the end of the driveway on his side and appears to be unconscious and convulsing.   Officer Brockmeyer performs a sternum rub.   Baker is placed on the ground on his side.



Officer Brockmeyer feels for Baker's pulse.   Baker begins to convulse.   Two of the officers are trying to contain Baker's movements.   One officer reports that Baker is actively resisting.   Baker is turned onto his other side.   Baker's pockets are searched.   A pill bottle was taken from one pocket.

Baker continues to convulsively move and one officer reports Baker is having a seizure. Baker hits his head on the pavement several times before Officer Brockmeyer places his foot

between Baker's head and the roadway.   Baker is lifted into a sitting position although he continues to move and has to be assisted to remain in that position.



Once in this position Baker's body is largely obstructed by the four officers surrounding him.   Baker continues to move whether intentionally or as a result of seizure activity.   The view is further obstructed by officers searching Baker's backpack.   As previously noted, a gun is found in the backpack.



Baker comes back into partial view in a seated position with his movements not noticeable. At this point, the ambulance arrives.   Baker is brought to his feet and assisted in walking to the stretcher.



Baker is placed on the stretcher and as he is moved to the ambulance his eyes are closed so it is impossible to say if he was conscious or not.



The remainder of this video provides no relevant information regarding .

The video labelled exhibit 18 is from Officer Brockmeyer' s dash cam.   The audio is not on at the beginning of the video.   The video begins as Baker is being placed in the back seat of the patrol car.   Baker is wearing a hospital gown and a face mask.   An officer is located on each side of the patrol car.   The officer on the left side of the patrol car is on the back seat and has his hands on Baker's torso and pulls him backwards across the seat.   The other officer lifts Baker's legs and feet into the car.   Throughout Baker's eyes are closed.

24





Baker is assisted into a sitting position facing the window on the right side of the car.



His right shoulder is against the back seat.   His head is slumped towards the window. Baker's head and torso fall further towards the door with his head now almost tucked into the space between the door and the back seat.   His neck is turned to the right.



No safety belt is put around Baker.   Except at one point, Baker does not move his wrists, hands, or fingers despite being handcuffed behind his back.

26

After the officers get into the car, the audio is engaged.   Baker's body moves up and down with the movement of the vehicle.

There are times when Baker appears to be moving or lifting his shoulders slightly; however, throughout the drive Baker remains slumped with his head against the door.   At one point, Baker partially closes his fists but then his fingers slowly relax although they remain partially curved towards the palms of his hands.   The video does not depict Baker's arrival at the BCDC.

## II.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Com. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*

*v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.   In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) each defendant acted under color of state law, and (2) that he or she violated a right secured by the constitution.   *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999).   In this case, there are no issues as to whether the Defendants were acting under color of state law.   Accordingly, the sole issue is whether one or more of the Defendants' actions violated Baker's federal constitutional rights.

### A.   Officer Skaggs' Motion for Summary Judgment

Officer Skaggs moves for summary judgment on the following grounds:   (1) Baker failed to exhaust the administrative remedies of the BCDC; (2) there is no constitutional injury to be remedied; and (3) he is entitled to qualified immunity.[11]

### 1.   Exhaustion of Administrative Remedies

Officer Skaggs maintains there is no evidence Baker exhausted or attempted to exhaust the BCDC grievance procedure.   Officer Skaggs concedes that Baker testified he submitted a paper grievance.   However, Officer Skaggs maintains there is no evidence to support this claim.

The Prison Litigation Reform Act ("PLRA") mandates exhaustion of available administrative remedies before an inmate files suit.   Section 1997e(a) of the PLRA provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any

---

[11] Officer Skaggs also argues he is entitled to summary judgment on the official capacity claim brought against him.   However, this claim has already been dismissed.   (ECF No. 6).

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U. S. C. § 1997e(a).

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "exhaustion [as required by the PLRA] is not *per se* inadequate simply because an individual later sued was not named in the grievances."  *Id.* at 219.   "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id.* at 218 (internal quotation marks and citation omitted).   The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id.*

The Eighth Circuit Court of Appeals has recognized only two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures, or (2) when the officials themselves fail to comply with the grievance procedures.  *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (explaining a prisoner is only required to exhaust those administrative remedies that are "available" and any remedies that prison officials prevent a prisoner from utilizing are not considered available).

The BCDC has a grievance procedure.  (ECF No. 33-7 at 15).   The first step in the grievance procedure is an informal process in which the inmate typically verbally discusses the specific issue with a staff member.  *Id.* at 15-16.   If the problem cannot be resolved through informal discussions, the inmate may submit "a written grievance through the kiosk or via a paper form."  *Id.* at 16.   The inmate is instructed that "[a] problem that results from a specific event or

29

action is presented on the approved form within seven [7] days of the occurrence." *Id.* The policy further provides:

> The grievance:
> a.  Is in writing or submitted through the kiosk;
>> i.  A grievance shall be submitted in the form of a written statement by the inmate, promptly following the incident on a specified for[m] or via the kiosk.
> b.  Clearly defines the situation in question and the facts upon which it is based;
> c.  Specifies the wrongful act or situation in question and the facts upon which it is based;
> d.  Arises out of an act or failure to act by the Benton County Detention Center;
> e.  Addresses a matter within the control of the facility;
> f.  Requests a remedy that is within the power of the facility to grant;
> g.  Is submitted within seven [7] days of the occurrence;
> h.  Includes a copy of any written supporting documents or pertinent discussion, decision, justification;
> i.  Specifies a requested remedy.

(ECF No. 33-7 at 17).   These provisions, with the exception of subsection "h," are echoed in the BCDC Inmate Handbook.   *Id.* at 35.

Officer Skaggs has provided the requests and grievances submitted by Baker via the kiosk from August 2020 through March 2021.   (ECF No. 33-3).   By affidavit, Officer Skaggs states he had "no idea that Baker was suggesting anything inappropriate happened during his intake or booking at the [BCDC] until I was served with this lawsuit."   (ECF No. 33-10 at 4).   Because Baker did not file a timely grievance, Officer Skaggs maintains he was denied an opportunity to preserve the video from Baker's intake.

Once Baker received discovery in his criminal case in December of 2020, he testified that he submitted a paper grievance because the kiosk was down; he never received a response to, or a copy of, the grievance.   (ECF No. 33-8 at 108-09).   Until he received the discovery, Baker was unaware that Officer Skaggs was the intake officer.   *Id.* at 105.   About a week after he received his discovery, Baker testified he spoke to Officer Skaggs who admitted he was the intake officer.

*Id.* at 104-05.   Baker also offered the contradictory testimony that his criminal attorney told Baker "not to touch on it . . . while [he] was inside the jail because Officer Skaggs still had access to me." *Id.* at 106.   Finally, after Baker named Officer Skaggs as a Defendant, Baker testified he complained that Officer Skaggs should not be coming to his "cell house."   *Id.* at 107 & 110.

In his summary judgment response, Baker does not address the issue of whether he exhausted the available remedies at the BCDC.   There is simply no evidence that Baker submitted a grievance within seven (7) days of his admittance to the BCDC   *Woodford,* 548 U.S. at 90 (proper exhaustion is in accord with incarcerating facility's "critical procedural rules"); *Jones,* 549 U.S. at 218 (to satisfy the PLRA, a prisoner must fully and properly comply with the specific procedural requirements of incarcerating facility).   Baker does not deny he was provided with the Inmate Handbook containing the grievance procedure.   It is clear Baker knew how to use the kiosk by August 19, 2020, when he began submitting numerous requests.   (ECF No. 33-3 at 1).   He submitted his first grievance on the kiosk on August 23, 2020.   *Id.* at 2.   The procedure was clearly capable of use.   His first mention concerning his intake to the facility was submitted on October 4, 2020, as part of a medical request, when he stated he was unconscious when he arrived and woke up changed out of his clothes and in stripes and said he did not feel the same.   *Id.* at 4. Viewing the facts in the light most favorable to Baker, he did not submit any document referring to his alleged unconscious state at intake until he mentioned it on October 4, 2020, in a medical care request.   Baker's own testimony compels the conclusion that his first grievance was submitted in paper form after he learned of Officer Skaggs' identity in December of 2020.[12]

---

[12] Officer Skaggs argues Baker was required to name him in the grievance.   However, this is not a requirement of the BCDC grievance procedure.   Officer Skaggs cites *Burns v. Eaton,* 752 F.3d 1136 (8th Cir. 2014), in support of his argument.   However, *Burns* dealt with the provisions of the Arkansas Division of Correction's grievance procedure which did require the prisoner to

Baker makes no argument that Officer Skaggs or other BCDC staff interfered in anyway with his use of the grievance procedure.   The next inquiry is whether the procedure itself was otherwise unavailable.     In *Ross v. Blake,* 578 U.S. 632,643 (2016), the Supreme Court noted that a grievance procedure may be unavailable when it is a "simple dead end."   However, a grievance procedure is not a dead end as "long as the 'the administrative process has authority to take *some action* in response to a complaint, [even if] not the remedial action the inmate demands.'" *Muhammad v. Mayfield,* 933 F.3d 993, 1000 (8th Cir. 2019)(quoting *Booth v. Churner,* 532 U.S. 731, 741 (2001)).   The courts "are not generally empowered to excuse a failure to exhaust so long as remedies are available." *Hansmeier v. Fikes,* No. 21-cv-1979, 2022 WL 9499464, *3 (D. Minn. Sept. 15, 2022)(citing *Ross v. Blake,* 578 U.S. 632, 639 (2016)).   Next, a process is too opaque or incomprehensible when an ordinary prisoner is unable to navigate it.   *Elliott v. Hall, et al,* No. 1-19-cv-57, 2020 WL 3248414, *1 (E.D. Ark. June 16, 2020).   Baker makes no argument the BCDC grievance procedure was either a dead end or too opaque or incomprehensible to be utilized.

Thus, the failure to exhaust is fatal to Baker's claims against Officer Skaggs.   As Officer Skaggs is entitled to summary judgment on the grounds Baker failed to exhaust his administrative remedies, there is no need to discuss Officer Skaggs' alternative arguments.

**B.   The BVPD Defendants' Motion for Summary Judgment**

The BVPD Defendants maintain they are entitled to summary judgment in their favor on the following grounds:  (1) they had probable cause, or at the least arguable probable cause to arrest Baker; (2) the amount of force used was reasonable under the circumstances; (3) they are

specifically name all involved staff members.

entitled to qualified immunity on both claims; and (4) the evidence is clear the Baker was conscious when placed in the patrol car at the hospital and upon arrival at the BCDC.

### 1. Probable Cause for Arrest

"In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004). "Probable cause is not a high bar:   It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act." *Kaley v. United States,* 571 U.S. 320, 338 (2014)(cleaned up).   "The existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Bell* v. *Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020)(quoting *Devenpeck,* 543 U.S. at 152); *see also Gerstein v. Pugh,* 420 U.S. 103, 111-12 (1975)("[The] probable cause standard 'is a practical, nontechnical conception, that calls for facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.")(cleaned up). It is an "objective standard requiring that '[w]e afford officers substantial latitude in interpreting and drawing inference from factual circumstances.'" *Brown v. City of St. Louis,* 40 F.4d 895, 899 (8th Cir. 2022)(quoting *Just v. City of St. Louis,* 7 F.4th 761, 767 (8th Cir. 2021)).

Alternatively, "[a]n officer is entitled to qualified immunity if there is at least arguable probable cause." *Kingsley v. Lawrence Cnty., Mo.,* 964 F.3d 690, 697 (8th Cir. 2020)(cleaned up). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." *Id.* at 697-98 (cleaned up).

The BVPD Defendants state their original purpose for trying to find Baker was to question him about the reported disturbance on the bus.   Beginning with *Terry v. Ohio,* 392 U.S. 1 (1968),

the BVPD Defendants note the Supreme Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further.   Next, the BVPD Defendants assert that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."   *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000).   Similarly, they maintain flight is an additional factor to be considered.   "Headlong flight—wherever it occurs—is the consummate act of evasion:   It is not necessarily indicative of wrongdoing, but is certainly suggestive of such." *Id.*

The BVPD Defendants maintain they did not violate the Fourth Amendment in chasing Baker in order to question him about smoking on the bus, a federal offense.   The officers' suspicions were heightened when dispatch advised them that Baker fled after learning the police were called.[13]   Given the unusual circumstances, the officers state they also had suspicions Baker might be "running from police for a reason."

**(a).   Disorderly Conduct**

The BVPD Defendants first argue they had probable cause, or at least arguable probable cause, to arrest Baker for disorderly conduct for causing a disturbance on the bus and his actions at 12 Abingdon Lane.   In support, they cite to Ark. Code Ann. § 5-71-207(a)(1), (4) & (5). Section 5-71-207 provides:

(a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:

(1) Engages in fighting or in violent, threatening, or tumultuous behavior;

---

[13] Hogue's witness statement does not indicate there was any type of disturbance on the bus; instead, Hogue merely states Baker continued to deny he was smoking.   (ECF No. 35-8 at 1).   Similarly, there is no statement that Hogue informed Baker he was going to call the police.   *Id.*

     (4) Disrupts or disturbs any lawful assembly or meeting of persons;

     (5) Obstructs vehicular or pedestrian traffic.

*Id.*

     The various subsections are "merely different ways of proving a single violation." *Johnson v. State,* 37 S.W.3d 191, 195 (Ark. 2001)(evidence of "erratic behavior, cursing, flailing his arms, and his demeanor toward [the police officer] is sufficient" to support a conviction under subsection (a)(1) or (a)(2)).   In connection with subsection (a)(1) the Arkansas courts have held that "[a] public inconvenience, annoyance or alarm can occur due to an individual's conduct whether the individual and the people are on public *or* private property." *M.T. v. State,* 350 S.W.3d 792, 794 (Ark. App. 2009).   Further, the statute does not require "an actual public inconvenience, annoyance or alarm." *Id.*   "A person acts purposefully with respect to his conduct when it is his conscious object to engage in conduct of that nature or to cause such a result." *Id.*   The term recklessly is defined in Ark. Code Ann. § 5-2-202(3) as follows:

     (A) A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.
     (B) The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

*Id.*

     According to the BVPD Defendants, they had probable cause to believe Baker's actions in allegedly smoking on the bus constituted disorderly conduct because it caused the bus driver to pull over, it disrupted all of the other bus passengers' travel, and it caused the bus driver to call 911 and request assistance in removing Baker from the bus in case he became combative.

Baker denied he smoked on the bus.  When the bus passengers were interviewed, they reported smelling no smoke.   After calling 911, Hogue then indicated he did not want to pursue any charges against Baker.   These facts were reported to the officers via radio transmission prior to their arrest of Baker.

While "an officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime," an officer is not free to ignore "plainly exculpatory evidence that negated the intent" required for the crime.   *Kuehl v. Burtis,* 173 F.3d 646, 650-51 (8th Cir. 1999). "[T]he Fourth Amendment requires that we analyze the weight of all the evidence—not merely the sufficiency of the incriminating evidence—in determining whether [the officer] had probable cause to arrest" for the crime at issue.   *Id.* at 650.   "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered … if the agents … wait to obtain more facts before seeking to arrest."   *Id.*    Additionally, officers may rely on hearsay statements to determine that probable cause exists.   *Illinois v. Gates,* 462 U.S. 213, 241-42 (1983); *see also Carpenter v. Gage,* 686 F.3d 644, 649 (8th Cir. 2012)("report from dispatcher provides reasonably trustworthy information").

At the time of the arrest even considering the exculpatory evidence, the totality of circumstances was sufficient to lead a reasonable person to believe Baker had committed or was committing the offense of disorderly conduct within the meaning of the subsection (a)(1) when Baker was accused of smoking on the bus; the bus driver pulled over and requested assistance; and Baker fled.   At a minimum, there was arguable probable cause to believe Baker had committed or was committing the crime of disorderly conduct.

The BVPD Defendants then argue Baker's actions at 12 Abingdon Lane gave them at least arguable probable cause to arrest him for disorderly conduct. They note Baker's actions alarmed Clifford; Baker was rummaging through things in the garage; Baker was trying to hide his backpack; Clifford told Baker to leave the garage; after officers drove by, Baker's demeanor changed and he because cagey, agitated, and was moving around a lot; Baker attempted to flee from officers into the garage and towards the door of the house; Clifford attempted to prevent Baker from entering the house. The BVPD Defendants maintain that after Baker was taken to the ground he continuously struggled with and resisted officers. Finally, they assert Baker undoubtedly caused alarm when he engaged in fighting and threatening behavior.

In *State v. Bocksnick,* 593 S.W.3d 176 (Ark. 1980), the Arkansas Supreme Court held that a defendant's actions in refusing to surrender to officers, threatening to kill the city marshall[14], and firing two shots at police officers could constitute disorderly conduct or resisting arrest, or both. The Court believes there was at least arguable probable cause to arrest Baker for disorderly conduct at 12 Abingdon Lane.

**(b).  Fleeing**

The BVPD Defendants additionally maintain they had probable cause, or at least arguable probable cause, to arrest Baker for fleeing on foot because he fled by foot and continued to flee even after several encounters with law enforcement officers. Pursuant to Ark. Code Ann. § 5-54-125(a), a person flees on foot, "(a) If a person knows that his or her immediate arrest or detention is being attempted by a duly authorized law enforcement officer, it is the lawful duty of the person to refrain from fleeing, either on foot or by means of any vehicle or conveyance." Ark. Code

---

[14] Spelled this way in the case.

Ann. § 5-54-125(a).   Here, Baker contends he did not know Detective Duggan was an officer as he was in plain clothing and had his gun aimed at Baker.   Baker could not hear anything Detective Duggan said.   Detective Duggan asserts he yelled police and ordered Baker to put his hands up. Further, Detective Duggan states he was displaying his badge on his waist band.

In *United States v. Finley,* 56 F.4th 1159 (8th Cir. 2023), Finley presented a similar argument maintaining the officers were in plain clothes, did not yell police, and although they were wearing tactical vests containing a police label, the vests were obscured by the raised firearms. *Id.* at  1165.   The Eighth Circuit noted that "Finley's 'perception of the officers is not relevant because we draw our conclusion from the facts known to the arresting officer at the time of the arrest.'"  *Id.* (quoting *United States v. Flores-Lagonas,* 993 F.3d 550, 561 (8th Cir. 2021)).   It was further noted that the officers issued "quintessential law enforcement orders that accompany arrest," *i.e.,* for Finley to put his hands up and to get on the ground.  *Id.*   The Eighth Circuit concluded the totality of the circumstances "was sufficient to lead a reasonable officer to believe that Finely was fleeing with an intent of avoiding arrest."  *Id.* at 1165-66 (Minnesota fleeing statute at issue).   Additionally, the Eighth Circuit has "consistently held that a defendant's response to an arrest or *Terry* stop—even an invalid one—may constitute independent grounds for arrest."  *United States v. Flores-Lagonas,* 993 F.3d 550, 560 (8th Cir. 2021)(collecting cases). Given the totality of the circumstances, the Court concludes the BVPD Defendants had at least arguable probable cause to believe Baker had committed the offense of fleeing.   Consequently, Baker's arrest and the search of his backpack did not violate his Fourth Amendment rights.

Having found probable cause that at least arguable probable cause to arrest existed on at least three separate grounds, the Court need not address the remaining crimes for which the BVPD Defendants maintain probable cause existed.   Further, having found no constitutional violation

exists, the BVPD Defendants are entitled to qualified immunity on this Fourth Amendment no probable cause claim.   *See, e.g., Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### 2.  Equal Protection[15]

Baker contends the pursuit by the BVPD, despite Hogue's statement that he did not want to file charges, was "fueled by hatred and systemic racism."  (ECF No. 1 at 14).   The Equal Protection Clause of the Fourteenth Amendment "prohibits selective enforcement of the law based on considers such as race. . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."   *Whren v. United States,* 517 U.S. 806, 813 (1996).   Where the claim is selective enforcement of the laws, Plaintiff must prove the Defendant:

> exercised his discretion to enforce the . . . laws on account of [his] race, which requires proof of both discriminatory effect and discriminatory purpose.   When the claim is selective enforcement of the . . . laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not . . . arrested in order to show the requisite discriminatory effect and purpose.

*Johnson v. Crooks,* 326 F.3d 995, 1000 (8th Cir. 2003).

Here, Baker has "offered no evidence that [the Defendants] do[] not stop non-African Americans under similar circumstances."  *Id.*   Furthermore, Baker has offered no direct evidence of racial discrimination.  *Id.*   No aspect of the encounter evidences racial animus.  *Id.*   Racial animus does not exist merely because the suspect is African-American and the police officers are Caucasian.   Baker's Motion for Summary Judgment on this claim must therefore be denied.

---

[15] The BVPD Defendants did not separately address this claim.

### 3.  Excessive Force

Where an excessive force claim arises in the context of an arrest, it is most properly characterized as one invoking the protections of the Fourth Amendment.  *See Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  In evaluating an excessive force claim under the Fourth Amendment, a court must consider whether the force was objectively reasonable under the circumstances, "rely[ing] on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight.'"  *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)).  The application of this standard requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-397.

In *Chambers v. Pennycook,* 641 F.3d 898 (8th Cir. 2011)*,* the Eighth Circuit held "evidence of only *de minimis* injury" does not "necessarily foreclose[ ] a claim of excessive force under the Fourth Amendment."  *Id.* at 906.  Rather, "[t]he appropriate inquiry is 'whether the force used to affect a particular seizure is 'reasonable."  *Id.*  The court reasoned "it is logically possible to prove an excessive use of force" can still "cause only a minor injury," and such claims should not be foreclosed based solely on the extent of the injury suffered.  *Id.*

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Foster v. Metro. Airports Comm'n,* 914 F.2d 1076,

1081 (8th Cir. 1990).   In order to conduct an arrest, some degree of force is necessary.   Therefore, the fact that force is used during an arrest does not *ipso facto* establish a Fourth-Amendment violation.   *Crumley v. City of St. Paul,* 324 F.3d 1003, 1007 (8th Cir. 2003) ("Fourth Amendment jurisprudence has long recognized…the right to make an arrest…necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Here, Baker admits he knew the BVPD Defendants were police officers when he stood up, turned his back to them, and began moving toward the door leading into the home.   While Baker denies he had his hand in his backpack, he agrees he had his backpack in one hand and Clifford's phone in the other.   Baker also admits that when he was taken to the ground, his reaction was to resist and struggle.

According to Clifford, as soon as the unmarked police car drove by, Baker started to act differently becoming "cagey, agitated, and moving around a lot."   (ECF No. 35-22 at 1).   When the officers approached the garage introducing themselves, Baker "immediately" reached "his hand into his backpack and he headed for the door that went into the house."   *Id.*   Clifford attempted to cut Baker off; and yelled to the officers that Baker was reaching into his backpack. *Id.*   Once on the ground, Clifford indicates Baker still had one of his hands inside of the backpack. *Id.*   The officers were telling Baker to get his hand out of the backpack.   *Id.*   Clifford "did not witness any of the officers kick," punch, or beat Baker.   *Id.* at 2.   Clifford states the officers were merely trying to get Baker's hand out of the backpack and get him handcuffed.   *Id.*   Clifford reports that Baker "never stopped struggling or resisting with the officers, while he was on the ground and all the way until he was put in the car."   *Id.*

Judging the use of physical force from the perspective of a reasonable officer on the scene, it was objectively reasonable for the officers to take Baker to the ground as he had turned his back

on the officers, refused to obey orders, was moving further into the garage, and appeared to be attempting to reach into his backpack.   It was objectively reasonable for the officers to interpret Baker's actions as a realistic threat to their personal safety and to the safety of others in the vicinity including Clifford.   The circumstances were "tense, uncertain, and rapidly evolving."   *Graham,* 490 U.S. at 397; *see also Procknow v. Curry,* 826 F.3d 1009, 1014 (8th Cir. 2016)(consideration should be given to the timing, warnings, and physical capacity of the subject).   "Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing."   *Carpenter v. Gage,* 686 F.3d 644, 649-50 (8th Cir. 2012)(citing *Mann v. Yarnell,* 497 F.3d 822, 826 (8th Cir. 2007)).

Generally speaking, the use of a taser against a suspect who is actively resisting arrest does not violate the Fourth Amendment.   *See e.g., Carpenter,* 686 F.3d at 649-50 (arrestee tased twice during deputies' efforts to get him handcuffed).   In *Carpenter,* the Court noted that "[e]ven if [the arrestee's] motive was innocent [such as characterizing his struggles as an effort to breathe], the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest."   *Id.* at 650.   The Eighth Circuit therefore held the deputies to be entitled to qualified immunity on the excessive force claim.   *Id.*; *see also Zubrod v. Hoch,* 907 F.3d 568, 577 (8th Cir. 2018)(arrestee "posed a threat to the safety of the deputies and assault victim   until subdued and handcuffed").

The Court concludes the Fourth Amendment was not violated when Sergeant Henson utilized his taser in drive-stun mode twice during the quickly evolving events involved in taking Baker to the ground and getting him to submit to being handcuffed.   The situation was dynamic and the BVPD Defendants did not know what, if any, weapons Baker might have in the backpack. Having so concluded, the BVPD Defendants are also entitled to qualified immunity on this claim.

*Krout,* 583 F.3d at 564.

### 4.  State of Consciousness

"In a § 1983 substantive due process lawsuit, the threshold question is whether the behavior of the governmental officers is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.  *Buckley v. Hennepin Cnty.,* 9 F.4th 757, 763 (8th Cir. 2021).   In *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998), the Supreme Court stated:

> our Constitution deals with the large concerns of the governors and the government, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.   We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.   It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Id.*   (cleaned up).

As previously noted, Baker contends he was transported to the BCDC and accepted into the facility in an unconscious state.   He maintains the video from Officer Brockmeyer's dash cam supports his claim.

The evidence shows that the physician at Mercy Hospital made the decision that Baker could be released to the custody of the officers.   The decision was not made by Officer Brockmeyer; nor is there any suggestion he had any involvement in the decision.   Officer Brockmeyer then transported Baker to the BCDC.   There is no video of Baker's movements from the hospital to the patrol vehicle.   The video does show that Baker needed assistance in getting into the police vehicle and seems to be sleeping throughout the ride.   Baker makes some voluntary movements of his shoulders at one point and his hands at another point.   Other than these

movements, Baker had his head and his legs turned towards the door with his upper body bent at the waist.   Clearly, Baker appeared drowsy and appeared to sleep during his transport. Unfortunately, there is no video of Baker being removed from the patrol vehicle or of his state of consciousness during the intake procedures.   Officer Brockmeyer's involvement ended at this point.[16]

Based on the summary judgment record, the Court concludes there is no genuine issue of material fact as to whether Officer Brockmeyer's conduct in transporting Baker to the BCDC for booking was so egregious, outrageous, or shocking to the contemporary conscience that the conduct violated substantive due process.   Baker was deemed fit to be discharged by the hospital. While the sedative administered at the hospital may have had a lingering effect making Baker drowsy and apparently affecting his memory, a BCDC nurse deemed him suitable for intake. Thus, medical professionals made the decisions that Baker's condition was suitable for discharge from the hospital and for admission to the BCDC.   Officer Brockmeyer is entitled to summary judgment on this claim.   Having so concluded, Officer Brockmeyer is also entitled to qualified immunity on this claim.   *Krout,* 583 F.3d at 564.

## IV.   CONCLUSION

Based on the summary judgment record and for the reasons set forth above, it is recommended that:

- the Motion for Summary Judgment (ECF No. 31) filed by Officers Skaggs be **GRANTED;**

---

[16] It has been recommended that Baker's claims against Officer Skaggs based on his intake into the BCDC and being changed into a jail uniform be dismissed on exhaustion grounds.

- the Motion for Summary Judgment (ECF No. 35) filed by Officer Brockmeyer, Detective Duggan, Sergeant Henson, and Detective Williams be **GRANTED**;

- the Motion for Summary Judgment by Baker in his Response (ECF No. 50) be **DENIED and this case be DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of March 2023.


_s/_ *Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE